IN THE IOWA DISTRICT COURT FOR CLINTON COUNTY

| | |
|---|---|
| TIMOTHY SCHMITZ, | Case No. LA 40680 |
| Plaintiff, | |
| vs. | |
| CLAUSEN SUPPLY CO., JON CLAUSEN, and KCAH, INC. d/b/a ALLSTAR STAFFING. | PETITION AT LAW AND JURY DEMAND |
| Defendants. | |

COMES NOW the Plaintiff, Timothy Schmitz, by and through his attorneys, and for his cause of action hereby states the following:

### INTRODUCTION

1.  This is an action under the Iowa Civil Rights Act (ICRA), the Americans with Disabilities Act (ADA), the Family and Medical Leave Act (FMLA), and Iowa Code Section 730.5, challenging Defendants' disability discrimination and retaliation directed at Plaintiff, Defendants' violation of the FMLA, and Defendants' violation of Iowa's private sector drug testing statute.

2.  Plaintiff Timothy Schmitz is a resident and citizen of Clinton County, Iowa.

3.  Defendant KCAH, Inc., d/b/a Allstar Staffing, is an Iowa corporation doing business in Clinton County, Iowa.

4.  Clausen Supply Co. is an Iowa corporation doing business in Clinton County, Iowa.

5.  Defendant Jon Clausen is a resident and citizen of Clinton County, Iowa.

1

**EXHIBIT**

**A**

6. The acts of which Plaintiff complains occurred in Clinton County, Iowa.

## PROCEDURAL REQUIREMENTS

7. On approximately January 1, 2013, within 300 days of the acts of which he complains, Plaintiff filed charges of employment discrimination against Defendants with the Equal Employment Opportunity Commission and the Iowa Civil Rights Commission.

8. On approximately September 3, 2013, less than 90 days prior to the filing of this Petition, the Iowa Civil Rights Commission issued a Right-to-Sue letter with respect to Plaintiff's charges.

## FACTUAL BACKGROUND

9. On May 5, 2011, Timothy "Tim" Schmitz began working for Clausen Supply Co. as a sheet metal fabricator.

10. As a sheet metal fabricator, Tim was responsible for providing labor support and material handling to fabricate, assemble, and prepare sheet metal products.

11. Throughout his employment with Defendants, Tim worked 40 to 46 hours per week and would consistently volunteer to work on his days off.

12. Defendants never complained to Tim about his work performance nor did Defendants ever discipline him.

13. In August 2011, Tim started suffering heart, chest, and joint pain. Tim's physician ordered him to avoid strenuous activity until a definite diagnosis could be made.

14. Tim was off work, on employer-sponsored short-term disability, from August 19, 2011, through September 18, 2011.

15. On September 18, 2011, Tim's physician released him to return to work. Tim returned to work and continued to meet or exceed Defendants' work expectations and requirements.

16. Tim continued to suffer from chest, heart, and joint pain. He sought additional treatment from specialists at the University of Iowa, but his condition did not substantially improve.

17. On approximately May 4, 2012, Tim began experiencing a severe increase in pain. Tim applied for, and was granted, leave under the Family and Medical Leave Act.

18. Tim's FMLA leave began on May 7, 2012. Defendants hired a temporary employee to cover Plaintiff's position while Tim was on FMLA leave.

19. On May 10, 2012, Tim's pain became so severe that he could not urinate or stand on his own. Tim sought emergency medical treatment at a local hospital.

20. On May 15, 2012, Dr. Andrew Reger, University of Iowa Hospitals and Clinics, wrote a letter to Defendants, advising them that Tim's "joint pain is limiting his activity considerably, and is requiring more medications to manage his pain." Dr. Reger excused Tim from work through May 21, 2012.

21. On approximately May 24, 2012, Tim was diagnosed with chronic Lyme disease.

22. Tim immediately notified Defendants of his diagnosis and advised them that he intended to return to work while obtaining treatment for the disease.

23. Tim attempted to return to work, but Defendants refused to allow him to return unless he would provide them with all of his confidential medical records and

submit to an examination by an occupational medical doctor employed by Defendants. Tim wanted to return to work, so he underwent the forced examination.

24. Tim disclosed to the Defendants' physician that he was taking prescription medications, including Hydrocodone. Defendants' physician told Tim that the prescription was not a problem and had Tim sign a form promising to be "responsible" with his medications.

25. Tim provided biweekly updates to Defendants, through phone calls with Human Resources Manager Rosalee Daniels.

26. On approximately July 12, 2012, Tim called Daniels to provide an update on his condition and treatment. Daniels informed Tim that his FMLA leave was nearly exhausted.

27. Daniels told Tim that if he did not return to work by August 6, 2012, he would be fired.

28. Tim asked Defendants for additional time to seek treatment and recover, but Defendants refused to allow any additional leave.

29. Daniels told Tim that it was company policy to fire any employee that required more leave than required by the FMLA, and that no exceptions could be granted.

30. Tim returned to work on August 6, 2012.

31. Tim occasionally moved slower than normal, limped, or sweat profusely while working. Tim performed the essential functions of his job and met production deadlines in spite of these symptoms. Tim's work output and performance continued to meet or exceed Defendants' requirements.

32. Bruce Kokjohn was Tim's foreman and immediate supervisor. On approximately August 17, 2012, Kokjohn told Tim that he should not have returned to work if he wasn't "100% better."

33. On August 28, 2012, Tim suffered a flare-up in his left knee while working. Tim notified Daniels of the flare-up and she advised Tim that he could leave early and use his previously accrued vacation time to cover the hours he would miss.

34. Tim's knee continued to swell, causing him severe pain. He used a vacation day on August 29, 2012.

35. At approximately 1:00 P.M., Tim's girlfriend, Sarah Norden, sent a message to Jon Clausen, Vice President and part owner of Clausen Supply Co., notifying Clausen of Tim's condition.

36. Jon Clausen called Ms. Norden at approximately 5:00 p.m. to discuss Tim's condition.

37. Ms. Norden suggested a number of reasonable accommodations for Tim's condition, and Clausen promised to meet with Tim the next day to formalize a plan. Clausen promised Ms. Norden that Tim's job was not in danger.

38. On August 30, 2012, Tim reported to work per his normal schedule. When Tim arrived, he was told he needed to meet with Bruce Kokjohn and Rosalee Daniels. Jon Clausen was not present.

39. Tim met with Kokjohn and Daniels. They informed Tim that he was being offered a "golden ticket" and that he would be "laid off" so that he could obtain unemployment benefits until his Lyme disease was completely treated.

40. Kokjohn and Daniels told Tim that he was not being fired and told him he could come back to work whenever he "felt better."

41. Daniels told Tim that his insurance would continue for 30 days.

42. Tim did not request time off work and did not want to lose his job.

43. On August 31, 2012, Tim received a letter from Defendants informing him that he had been fired and that his insurance coverage was cancelled effective the same day.

44. Approximately two weeks later, Tim went to Clausen's to determine his status with the company. He told Rosalee Daniels that he wanted to return to work as soon as possible.

45. Daniels told Tim that he needed to understand he was a "liability" to the company, and that he should look for work somewhere else.

46. Tim spoke with Bruce Kokjohn before leaving, and Kokjohn told him that Clausen's was not hiring.

47. The following Monday, Defendants filled Tim's position with the temporary worker that had been hired to cover Tim's FMLA leave.

48. Tim called Jon Clausen multiple times, trying to get permission to return to work. Finally, on November 28, 2012, Tim was invited to the shop for an interview with Jon Clausen and Bruce Kokjohn.

49. At the beginning of the interview, Tim provided Clausen with a note from his physician, releasing him to return to work without restrictions.

50. After asking Tim how he felt, Clausen told Tim that his "biggest concern" was Tim suffering additional flare-ups because of his Lyme disease.

51. Clausen admitted to Tim that he had been fired because of his disability, and that he would only be hired if his disability were "rectified."

52. Kokjohn stated that his "only concern" was Tim's physical health.

53. Clausen and Kokjohn asked Tim how long it had been since his last flare-up, which medications he was prescribed, how long he would need to take medication, and whether he would need "big treatments" in the future.

54. Near the close of the discussion, Clausen reiterated that Tim's disability was motivating their decisions: "We'd love to have you back, but we just got concerns about your health."

55. Clausen offered to hire Tim through Allstar Staffing, an employment agency operated by Kim Clausen. Kim Clausen is married to Peter Clausen, a part owner of Clausen Supply Co.

56. Clausen explained that Allstar Staffing would employ Tim for 60 days, and then Tim would move to Clausen Supply Co.'s payroll.

57. Tim reported to the Allstar Staffing office on November 28, 2012, to complete employment paperwork and complete a drug test. Tim met with Kim Clausen.

58. Tim attempted to provide information about his prescription medications for purposes of the drug test, but Kim Clausen refused to document the prescriptions and demanded that Tim return any medications to his vehicle before taking the test.

59. The next day, Allstar Staffing called Tim and told him that, while he was "within the limits" of drug screening, he could not be employed at Clausen Supply Co. because he would be "under the influence" of his medications. No medical review officer contacted Tim to discuss his medications.

60. Tim called Jon Clausen, and Clausen told Tim that he made Clausen "look like a turkey" because he hadn't told Clausen he was taking pain medication.

61. Tim explained that he was on pain medication prior to being fired in August 2012, and that he was allowed to work by simply signing a promise to be "responsible" with his medication.

62. Tim was denied employment with Clausen Supply Co. and Allstar Staffing.

63. Jon Clausen was an employee and agent of Defendant Clausen Supply Co., acting at all relevant times within the scope of his employment and agency.

64. Rosalee Daniels was an employee and agent of Defendant Clausen Supply Co., acting at all relevant times within the scope of her employment and agency.

65. Bruce Kokjohn was an employee and agent of Defendant Clausen Supply Co., acting at all relevant times within the scope of his employment and agency.

66. Kim Clausen was an employee and agent of Defendant KCAH, Inc., acting at all relevant times within the scope of her employment and agency.

67. Peter Clausen was an employee and agent of Defendant Clausen Supply Co., acting at all relevant times within the scope of his employment and agency.

## COUNT I
### VIOLATION OF THE IOWA CIVIL RIGHTS ACT
### DISABILITY DISCRIMINATION AND RETALIATION

68. Plaintiff repleads paragraphs 1 through 67 as if fully set forth herein.

69. Plaintiff was disabled within the meaning of the Iowa Civil Rights Act.

70. Plaintiff's Lyme disease substantially interfered with Plaintiff's major life activities, including but not limited to caring for himself, performing manual tasks, sleeping, walking, standing, lifting, concentrating, and working.

71. Plaintiff's Lyme disease also substantially interfered with the normal functioning of Plaintiff's musculoskeletal system, neurological system, immune system, and urological system.

72. Plaintiff was able to perform the essential functions of his job with or without reasonable accommodation.

73. Defendants failed to accommodate Plaintiff's disability in violation of the Iowa Civil Rights Act.

74. Defendants failed to engage in good faith in an interactive process with Plaintiff to assist in accommodating his disabilities, in violation of the Iowa Civil Rights Act.

75. Defendants discriminated against Plaintiff with respect to terms and conditions of his employment in violation of the Iowa Civil Rights Act.

76. Plaintiff's disability was a motivating factor in Defendants' discrimination.

77. Plaintiff complained about the discrimination he experienced and otherwise opposed practices made unlawful by the Iowa Civil Rights Act.

78. Defendants retaliated against Plaintiff, fired him, and refused to hire him because of his complaints and opposition to discrimination.

79. As a result of Defendants' illegal actions and omissions, Plaintiff has in the past and will in the future suffer injuries and damage, including but not limited to

mental and emotional distress, fear, anguish, humiliation, intimidation, embarrassment, lost enjoyment of life; medical expenses, lost wages, benefits, future earnings, and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, in an amount that will fully and fairly compensate him for his injuries and damages, for prejudgment and postjudgment interest, for attorney's fees and expenses, for the costs of this action, for appropriate equitable and injunctive relief, and for such other relief as may be just in the circumstances and consistent with the purposes of the Iowa Civil Rights Act.

## COUNT II
### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### DISABILITY DISCRIMINATION AND RETALIATION

80. Plaintiff repleads paragraphs 1 through 79 as if fully set forth herein.

81. Plaintiff was a "qualified individual with a disability" within the meaning of the Americans with Disabilities Act ("ADA").

82. Plaintiff's Lyme disease substantially limited Plaintiff's major life activities, including but not limited to caring for himself, performing manual tasks, sleeping, walking, standing, lifting, concentrating, and working.

83. Plaintiff's Lyme disease substantially limited the operation of Plaintiff's musculoskeletal system, neurological system, immune system, and urological system.

84. Plaintiff was able to perform the essential functions of his job with or without reasonable accommodation.

85. Defendants failed to accommodate Plaintiff's disability in violation of the ADA.

86. Defendants discriminated against Plaintiff because of his disability.

87. Defendants failed to engage in an interactive process with Plaintiff to determine how to accommodate his disability.

88. As a result of Defendants' illegal acts and omissions, Plaintiff has in the past and will in the future suffer damages as set forth above.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount that will fully and fairly compensate him for his injuries and damages, for punitive damages against Defendants in an amount sufficient to punish it and to deter it and others, for prejudgment and postjudgment interest, for attorney's fees and expenses, for the costs of this action, for appropriate equitable and injunctive relief, and for such other relief as may be just in the circumstances and consistent with the purposes of the ADA.

## COUNT III
## VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT

89. Plaintiff repleads paragraphs 1 through 88 as if fully set forth herein.

90. At all times material to this case, Defendant was considered an "employer" within the meaning of the FMLA.

91. At all times material to this case, Plaintiff was an "eligible employee" within the meaning of the FMLA.

92. Beginning in May 2012, at the latest, Plaintiff suffered from one or more "serious health conditions" within the meaning of the FMLA.

93. Plaintiff invoked his right to leave under the FMLA.

94. Plaintiff was entitled to leaves of absence pursuant to his rights under the FMLA.

95. Defendants retaliated against Plaintiff as a result of his exercise of his rights under the FMLA.

96. As a result of Defendants' illegal acts and omissions, Plaintiff has in the past and will in the future suffer damages as set forth above.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, in an amount that will fully and fairly compensate him for his injuries and damages, for liquidated damages, for prejudgment and postjudgment interest, for attorney's fees and expenses, for the costs of this action, for appropriate equitable and injunctive relief, and for such other relief as may be just in the circumstances and consistent with the purposes of the FMLA.

## COUNT IV
## VIOLATION OF IOWA CODE § 730.5

97. Plaintiff repleads paragraphs 1 through 96 as if fully set forth herein.

98. In November 2012, Defendant KCAH, Inc., d/b/a Allstar Staffing, required Plaintiff to undergo drug testing as a condition of his employment with Allstar Staffing and Clausen Supply Co.

99. In the course of undergoing drug testing, Plaintiff provided a urine sample.

100. Plaintiff was not provided an opportunity to provide information to be considered relevant to drug testing, including, but not limited to, the prescription drugs that he was using, in violation of Iowa Code § 730.5(7)(c)(2).

101. Defendants failed to properly confirm Plaintiff's initial positive test results, in violation of Iowa Code §§ 730.5(7)(f)-(g).

102. Defendants failed to notify Plaintiff in writing of the results of the test, of the name and address of the medical review officer who made the report, and of Plaintiff's right to request records, in violation of Iowa Code § 730.5(7)(i)(2).

103. Defendants failed to carry out the drug testing within the terms of a written policy and failed to make the written policy available for review by perspective employees, in violation of Iowa Code § 730.5(9)(a)(1).

104. As a result of Defendants' illegal acts and omissions, Plaintiff has in the past and will in the future suffer damages as set forth above.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, in an amount that will fully and fairly compensate him for his injuries and damages, for prejudgment and postjudgment interest, for attorney's fees and expenses, for the costs of this action, for appropriate equitable and injunctive relief, and for such other relief as may be just in the circumstances and consistent with the purposes of Iowa Code § 730.5.

### JURY DEMAND

COMES NOW the Plaintiff and hereby requests a trial by jury.

FIEDLER & TIMMER, P.L.L.C.

Brooke Timmer AT0008821
brooke@employmentlawiowa.com
Nathan Borland AT0011802
nate@employmentlawiowa.com
2900 – 100th Street, Suite 209
Urbandale, IA 50322
Telephone: (515) 254-1999
Fax: (515) 254-9923
ATTORNEYS FOR PLAINTIFF

13